**In re ENRON CORP., et al., Debtors.**

**No. 01–16034(AJG).**

United States Bankruptcy Court, S.D. New York.

Jan. 11, 2002.

Weil, Gotshal & Manges, LLP, Martin J. Bienenstock, Howard Comet, Kathryn L. Turner, of Counsel, New York City, Togut, Segal & Segal, LLP, Albert Togut, of Counsel, New York City, for Debtors.

Togut, Segal & Segal, LLP, Albert Togut, of Counsel, New York City, for Debtors.

Milbank, Tweed, Hadley & McCloy, LLP, Luc A. Despins, David R. Gelfand, of Counsel, New York City, for Official Committee of Unsecured Creditors of Enron Corp., et al.

Mary Elizabeth Tom, Office of the United States Trustee, Assistant United States Trustee, New York City.

Thompson & Knight, LLP, Rhett G. Campbell, David M. Bennett, of Counsel, Houston, TX, Carter, Ledyard & Milburn, Aaron R. Cahn, of Counsel, New York City, for Dunhill Resources I, LLC, Petro–Hunt, L.L.C., Tenaska Marketing Ventures, Pioneer Resources USA, Inc., Pure Resources, Inc., Spinnaker Exploration Company, Equiva Trading Company, Shell Chemical Risk Management Company, Shell Chemical L.P.

Carter, Ledyard & Milburn, Aaron R. Cahn, of Counsel, New York City, for EXCO Resources, Inc.

Office of The Attorney General–State of Texas, John Cornyn, Jeff Boyd, Hal F. Morris, of Counsel, Austin, TX.

Dalton, Gotto, Samson & Kilgard, P.L.C., Ron Kilgard, of Counsel, Phoenix, AZ, for Pamela M. Tittle, Thomas O. Padgett, Gary S. Dreadin, on behalf of themselves and a class of other persons similarly situated.

Barnet B. Skelton, Jr., of Counsel, Houston, TX, for Southern Ute Indian Tribe d/b/a Red Willow Production Company.

Akin, Gump, Strauss, Hauer & Feld, LLP, H. Rey Stroube, III, of Counsel, Houston, TX, for Dynegy, Inc., Statex Petroleum, Inc., Packaged Ice, Inc., and EC Power.

Baker Botts, L.L.P., David A. Burns, of Counsel, Houston, TX, for Reliant Energy Service, Inc.

Entwistle & Cappucci, LLP, Andrew J. Entwistle, of Counsel, New York City, for Florida State Board of Administration, Creditor, Equity Holder—Party In Interest.

Fulbright & Jaworski, LLP, David A. Rosenzweig, of Counsel, New York City, for El Paso Merchant Energy L.P.

Porter & Hedges, LLP, John Mathew Vaughn, of Counsel, Houston, TX, Herrick, Feinstein, LLP, Richard M. Meth, of Counsel, Newark, NJ, Herrick, Feinstein, LLP, Paul A. Rubin, of Counsel, New York City, for Anning–Johnson Company, Contour Energy Co., PDM Strocal and Phillips Petroleum Company.

Shearman & Sterling, Douglas P. Bartner, Fredric Sosnick, of Counsel, New York City, for Citigroup, N.A. and Citicorp USA, Inc.

Latham & Watkins, Gregg D. Josephson, of Counsel, New York City, for Wells Fargo Bank.

Davis, Polk & Wardwell, Donald S. Bernstein, Marshall S. Huebner, of Counsel, New York City, for J.P. Morgan Chase Bank.

Chadbourne & Parke, LLP, Howard Seife, of Counsel, New York City, for St. Paul Fire and Marine Insurance Company,

Continental Casualty Company, National Fire Insurance Company of Hartford, Federal Insurance Company, Fireman's Fund Insurance Company, Travelers Casualty & Surety Company, Travelers Indemnity Company, Liberty Mutual Insurance Company, Safeco Insurance Company of America, Hartford Fire Insurance Company, and Lumbermens Mutual Casualty Company, Dresdner Bank A.G. and KBC Bank NV.

Allen & Overy, James E. Atkins, of Counsel, New York City, for Barclays Bank and Barclays Physical Trading Limited.

Gilmartin, Poster & Shafto LLP, Howard C. Buschman III, of Counsel, New York City, for Banca Nazionale del Lavoro.

Willkie Farr & Gallagher, Tommy C. Ho, of Counsel, New York City, for IntesaBci, S.p.A.

Otterbourg, Steindler, Houston & Rosen P.C., William M. Silverman, of Counsel, New York City, for Bank of Tokyo–Mitsubishi, Ltd. and Bank Hapoalim B.M.

Honor S. Heath, Hartford, CT, Senior Counsel.

Maria M. Patterson, New York City, Counsel.

## MEMORANDUM DECISION REGARDING MOVANTS' REQUEST TO TRANSFER VENUE TO THE SOUTHERN DISTRICT OF TEXAS

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The issue before the Court is whether venue of these bankruptcy cases should be transferred from the Southern District of New York to the Southern District of Texas. Motions to transfer venue were filed by Dynegy, Inc. (and its affiliates), Statex Petroleum, Inc., Packaged Ice, Inc. (and its affiliates) and EC Power (collectively, "Dynegy"); Petro Hunt, L.L.C., Tenaska Marketing Ventures, Pioneer Resources USA, Inc., Pure Resources, Inc., Spinnaker Exploration Company, Equiva Trading Company, Shell Chemical Risk Management Company, Shell Chemical LP, and Dunhill Resources I, LLC (collectively, "Dunhill"); [1] Pamela M. Tittle, Thomas O. Padgett and Gary S. Dreadin, on behalf of themselves and a class of other persons similarly situated; Southern Ute Indian Tribe d/b/a Red Willow Production Company; and joinder motions filed by Reliant Energy Services, Inc.; Anning Johnson Company, Contour Energy Co., PDM Strocal and Phillips Petroleum Company; El Paso Merchant Energy L.P.; the Texas Comptroller of Public Accounts, Texas Workforce Commission, Texas General Land Office and Texas Natural Resource Conservation Commission; the Florida State Board of Administration; and EXCO Resources, Inc. (in the aggregate, the "Movants").

Opposition and statements in support of opposition to transfer venue were filed by the Debtors (as defined hereinafter); the Official Committee of Unsecured Creditors; JP Morgan Chase Bank & Co.; Citibank, N.A. and Citicorp USA, Inc.; Barclays Bank Plc and Barclays Physical Trading Limited; Industrial Bank of Japan Trust Company; Sumitomo Mitsui

---

**1.** The Dunhill Movants requested an expedited hearing for the venue motion. Thereafter, the request was withdrawn. A pre-motion conference was held on December 14, 2001. At that conference discovery issues were discussed and a briefing schedule established. No further request was made to reschedule the hearing date from January 7, 2002 to an earlier date. The Court notes that one of the Movants sought to adjourn the hearing to a date two weeks following the close of discovery, which would have resulted in a hearing in late January.

Banking Corporation; Westdeutsche Landesbank Girozentrale; Abu Dhabi International Bank Inc.; Dresdner Bank A.G.; The Bank of New York; KBC Bank NV; Fleet National Bank; First Union National Bank; IntesaBci S.p.A.; Banca Nazionale Del Lavoro; Bank of Tokyo Mistsubishi, Ltd.; Bank Hapoalim B.M.; St. Paul Fire and Marine Insurance Company, Continental Casualty Company, National Fire Insurance Company of Hartford, Federal Insurance Company, Fireman's Fund Insurance Company, Travelers Casualty & Surety Company, Travelers Indemnity Company, Liberty Mutual Insurance Company, Safeco Insurance Company of America, Hartford Fire Insurance Company, and Lumbermens Mutual Casualty Company.

The Debtors and most of the Movants stipulated to facts which are expressly undisputed. The Court's findings of fact are derived from the parties' Limited Stipulation of Facts for the Purposes of a Hearing on the Motion to Change Venue to the Southern District Of Texas ("Limited Stipulation of Facts"), filed on January 7, 2002 (doc. entry # 706), the evidence at the hearing, and from the entire record of the Debtors' cases and other matters of which this Court may take judicial notice. The Court held a hearing on the motions to transfer venue and opposition thereto on January 7, 2002. The record of that hearing was supplemented by a letter, dated January 8, 2002 (doc. entry # 784), submitted by Dunhill's counsel, designating portions of the deposition dated January 4, 2002 of Louis Colarusso, controller of Enron Metals & Commodities Corp. (Dunhill Exhibit # 1). The record was further sup-

plemented by a letter, dated January 8, 2002 (doc. entry # 770), submitted by Debtors' counsel designating additional portions of the Colarusso deposition and responding to Dunhill's argument regarding Dunhill's designated portions of the deposition.

Enron Metals & Commodity Corp. ("EMC"), Enron Corp., BAM Leasing Company, ENA Asset Holdings, L.P., Enron Broadband Services, Inc., Enron Energy Marketing Corp., Enron Energy Services Operations, Inc., Enron Energy Services, Inc., Enron Energy Services L.L.C., Enron North America Corp., Enron Power Marketing, Inc., Enron Transportation Services Company, PBOG Corp., Smith Street Land Company, Enron Engineering & Operational Services Company, Enron Engineering & Construction Company, Enron Net Works L.L.C., Enron Industrial Markets LLC, Enron Global Markets LLC, Enron Gas Liquids, Inc., Operational Energy Corp., Garden State Paper Company, LLC, Enron Federal Solutions, Inc., EESO Merchant Investments, Inc., Enron Energy Information Solutions, Inc., Tenant Services, Inc., Enron Broadband Services, L.P., Enron Freight Markets Corp., Palm Beach Development Company, L.L.C, and Enron Energy Services North America, Inc. (the "Debtors")[2] filed Chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York beginning on December 2, 2001 (the original 14 debtor filings) and continuing on various dates thereafter. The Debtors' cases are jointly administered under Case No. 01–16034.

---

2. These are the Enron Debtors that had filed bankruptcy petitions as of the date the parties entered into the Limited Stipulation of Facts. Subsequent to that date, four additional affiliated debtors have filed bankruptcy petitions. They are Enron LNG Marketing LLC, Calypso

Pipeline, LLC, Enron Global LNG LLC, and Enron International Fuel Management Company. Specific information concerning these four additional Debtors is not addressed in this Memorandum Decision.

## FACTS

### GENERAL BACKGROUND INFORMATION

Enron[3] is a large, multifaceted national and international corporation with operations, financial interests, creditors and stockholders across the United States and around the world. Enron Corp., an Oregon corporation, is a holding company of subsidiaries engaged in the wholesale and commodity market business, telecommunications and insurance. The Debtors divide their business operations into five primary business units: Enron Wholesale Services, Enron Retail Services, Enron Transportation Services, Enron Global Services and Enron Broadband Services. Enron's wholesale business unit, which includes marketing and trading of energy and other commodities, is Enron's core operation and main profit driver. During the past year, Enron maintained the world's largest on-line energy trading site (EnronOnline) and was the world's largest trader of electricity and natural gas.

Enron is currently directing those interested in doing business with Enron to make trades strictly via telephone and has temporarily suspended internet trading operations. These telephones are all operated in Portland, Oregon and Houston, Texas. None of the Debtors own real property located in New York. With the exceptions of Garden State Paper Company, LLC, EMC and Operational Energy Corp., all of the Debtors have identified their principal place of business as being Houston, Texas.

With two exceptions, the Debtors are organized under the laws of Oregon, California or Delaware. One Debtor is organized under the laws of Texas and another is organized under the laws of Pennsylvania. None of the Debtors is organized under the laws of New York.

All or substantially all of certain of the Debtors' corporate books and records (such as corporate minute books) are located at the corporate headquarters of Enron Corp. in Houston.

### THE DEBTORS' PENDING LITIGATION AND INVESTIGATIONS

There were 27 litigation matters pending against Enron in New York at the time of Enron's most recent 10K disclosure. None of those matters were listed by Enron under the section requiring disclosure of material litigation.

On December 2, 2001, an adversary proceeding in these cases entitled *Enron Corp., Enron Transportation Services Co., CGNN Holding Co., Inc. and MCTJ Holding Co. LLC v. Dynegy Inc. and Dynegy Holdings Co., Inc.* was commenced in New York. On December 3, 2001, Dynegy countersued in a Texas State Court in Houston. Both suits are breach of contract actions involving contracts governed by the laws of the State of Texas.

On November 13, 2001, a class-action lawsuit was filed against Enron and others in the United States District Court for the Southern District of Texas on behalf of the participants in the Enron Corp. Savings Plan (the "Enron 401(k) Plan"). The action is styled and numbered *Tittle et al. v. Enron Corp., et al.*, Case No. H–01–3913, and has been consolidated with at least eight other ERISA class actions filed against Enron Corp. in Texas (the "ERISA Action"). In the *Tittle* lawsuit, the plaintiffs allege, among other things, that under ERISA: (1) Enron is a fiducia-

---

**3.** In most instances, "Enron" refers to Enron Corp. and all of its affiliates-debtors and non-debtors.

ry of the Plan; and (2) Enron and the other fiduciaries breached their duties to the participants and beneficiaries of the Plan in a variety of ways. The Enron 401(k) Plan that is the subject of the *Tittle* lawsuit provides that "[a]ll provisions of the Plan shall be construed in accordance with the laws of Texas except to the extent preempted by federal law." The ERISA Action is stayed as to Enron Corp. pursuant to the automatic stay imposed by Section 362 of title 11 of the United States Code (the "Bankruptcy Code").

A number of Congressional committees, federal agencies, commissions, and departments have requested information and are conducting hearings and investigating Enron.

## THE DEBTORS' MANAGEMENT, OFFICERS AND DIRECTORS

Approximately fifty-five current or former officers of Enron Corp. reside in Houston, Texas or in the Southern District of Texas. Among the Debtors, only the Board of Enron Corp. includes outside directors. All of the directors of the other Debtors are inside directors who are also employees of one or more of the Debtors. Most of these inside directors hold the title of Director for numerous Enron entities and most inside directors reside in Houston, Texas or elsewhere in the Southern District of Texas.

## THE CREDITORS

The Debtors provided to Movants the best available accounts payable listing from their business records showing vendors of the Debtors who were owed money and their locations. The category of ven-

dors is one of several general categories of creditors. The listing was subject to correction and does not contain other types of creditors, including the following:

a. counterparties to swaps, hedges and physical contracts;

b. bank and lending debt;

c. Enron corporation's public bond debt;

d. former employee claims; and

e. governmental unit claims

Further, the listing contains inter-company debt. The parties each presented summary charts related to this information to the Court.

Enron Corporation's largest unsecured creditor is JP Morgan Chase (formerly Chase Manhattan Bank, at times referred to interchangeably) with an unsecured claim of $1.907 billion. At the time the debt was incurred, the office of Chase Manhattan Bank, in Houston, had responsibility for the loan. Chase Manhattan Bank's principal offices are in New York City and it is represented in the bankruptcy proceedings by New York counsel. Beginning at least several weeks before the Chapter 11 filing, the New York office of Chase assumed responsibility for the loan.

The Official Committee of Unsecured Creditors (the "Committee") is comprised of fifteen members. Of those fifteen members, six are located in New York City and three are located in Texas. The other six members of the Committee are located in Ohio, Canada, Minnesota, Maryland, California and Oklahoma. The following creditors have been appointed pursuant to 11 U.S.C. § 1102(a) and (b) to the Committee, effective December 12, 2001:

1. JP Morgan Chase & Co. (formerly Chase Manhattan Bank)
 New York, New York

2. Citigroup/Citibank
 New York, New York

3. ABN AMRO Bank
 New York, New York

4. Credit Lyonnais New York Branch
 New York, New York

5. Credit Suisse First Boston
 New York, New York

6. National City Bank as Indenture Trustee
 Cleveland, Ohio

7. Silvercreek Management, Inc.
 Toronto, Ontario

8. Oaktree Capital Management, LLC
 Los Angeles, CA

9. Wells Fargo Bank Minnesota, N.A., as Indenture Trustee
 Minneapolis, MN

10. The Bank of New York, as Indenture Trustee
 New York, New York

11. St. Paul Fire and Marine Insurance Company
 Baltimore, MD

12. National Energy Group, Inc.
 Dallas, Texas

13. Duke Energy Trading and Marketing, LLC
 Houston, Texas

14. Mr. Michael P. Moran, individually and as representative
 Montgomery, Texas

15. The Williams Companies, Inc.
 Tulsa, OK

---

Wells Fargo Bank Minnesota, N.A., as Indenture Trustee, located in Minneapolis, and The Williams Companies, Inc., located in Tulsa, Oklahoma, are the co-chairs of the Committee.

Enron Corporation's two largest secured creditors, Citibank, N.A. and Chase Manhattan Bank (now, JP Morgan Chase), have offices located in Houston, Texas, which had responsibility for administering the credit facility.

Enron Corporation has obtained a new $1,000,000,000 secured line of credit from JP Morgan Chase & Co. and Salomon Smith Barney secured by the assets of Transwestern Pipeline Company and Northern Natural Gas Company.

On January 3, 2002, a Revised List of Creditors Holding 20 Largest Unsecured Claims was filed for Enron Corp. The Revised List differed from the list that was attached as an exhibit to the Limited Stipulation of Facts in that three listings relat-

ing to two entities were deleted after it was determined that those entities were insiders. Additionally, the Debtors represented at the hearing, and Wells Fargo Bank Minnesota, N.A. confirmed, that Chase Manhattan Bank, Houston, Texas (Trustee) withdrew as indenture trustee and was substituted by Wells Fargo Bank Minnesota, N.A. As a result, Enron Corp. lists seventeen largest creditors, which are comprised of ten creditor listings in New York, three in the United Kingdom, two in South Dakota, one in Minnesota, one in Italy and none in Texas.[4] The ten creditor listings for New York include multiple listings of the Bank of New York, as Indenture Trustee with respect to several separate indentures, each of which has a separate group of bond or noteholders, who are located across the country.

Indenture Trustees for the holders of the prepetition notes of Enron Corp. and the agent banks for its prepetition credit facilities are as follows:

a. Bank of New York, New York City, New York;

b. Citibank, N.A., Sioux Falls, South Dakota Corp., Headquarters in NY;

c. Wells Fargo Bank Minnesota, N.A. (Trustee);[5]

d. Chase Manhattan Bank, London, United Kingdom; and

e. Banca Commerciale Italiana S.p.A., Piazza della Scala, Milan, Italy

With respect to the Indenture Trustees, there are twenty-five outstanding indentures of bonds or notes.

4. Prior to the revision, the twenty largest unsecured creditors of all the Debtors combined were the same as the twenty largest unsecured creditors of Enron Corp. After the revisions, the remaining seventeen largest are the same as well.

## THE DEBTORS' EMPLOYEES

As of December 2, 2001, the bankruptcy petition date, Enron Corp. and its affiliates employed approximately 25,000 full and part time employees worldwide (approximately 7,000 hourly wage employees and approximately 18,000 salaried employees). Just before the petition date, as of December 1, 2001, over 7,500 employees worked at the Debtors' Houston headquarters and resided in the Southern District of Texas. Approximately 7,000 employees worked worldwide. Of these employees, 5,496 were employees of the Debtors in these cases. Of these employees of the Debtors, 4,681 worked in Houston, and sixty-three of these employees of the Debtors worked in New York.

On December 3, 2001, Enron and its affiliates discharged approximately 60% (4,200) of their Houston employees. Since December 3, 2001, Enron has discharged an additional 200 of its Houston employees. Most of the Enron employees so discharged in the United States were employed in Houston. Enron has discharged twelve New York employees.

Currently, Enron and its affiliates employ a total of approximately 19,000 persons worldwide and approximately 3,000 of those employees work in Houston, Texas. Of these various employees, 1,687 are employed by the Debtors in Houston and fifty-seven are employed by the Debtors in New York. The remainder of the employees of the Debtors are located elsewhere.

Enron plans to provide severance benefits in an amount equal to $4,500 per severed employee, which will serve as a credit against accrued and unpaid wages,

5. As previously noted, Chase Manhattan Bank, Houston, Texas (Trustee) withdrew as indenture trustee and was substituted by Wells Fargo Bank Minnesota, N.A.

amounts due under the severance plan Enron had in place at the time of termination of employment, and any Enron obligation pursuant to the Worker Adjustment Retraining Notification Act. The $4,500 severance benefit has been paid to those employees discharged on December 3, 2001. The severance payment of $4,500 is less than the monthly salary of some of the Houston employees who were laid off.

Approximately 12,000 of Enron's employees participated in the Enron 401(k) Plan. As of January 2001, the Enron 401(k) Plan was composed mostly of Enron stock (61% of the 401(k) plan). Many employees have lost more than $100,000 of value in their 401(k) plans. Those persons whose retirement funds are in the Debtors' 401(k) Plan are among the Debtors' creditors. The Labor Department is investigating Enron's handling of employee 401(k) plans. In addition, as previously noted, the ERISA Action is pending in Texas.

On November 30, 2001, Enron Corp. and/or its affiliates paid $55 million in bonuses to 587 of its "key employees." The vast majority of these key employees are located in Houston.

Most of the Debtors' real property is located in Houston. Subsidiaries of the Debtor, Enron Corp., own interstate pipelines. The amount of ad valorem taxes owed to Texas taxing authorities by Enron is $139,878,630.

## THE BANKRUPTCY PROCEEDINGS

As part of its "first day" orders, the Debtors obtained an order from the Court authorizing the Debtors to enter into certain postpetition credit agreements (the "DIP Financing") in order to, *inter alia,* provide outside parties confidence in the Debtors that will enable and encourage them to resume ongoing credit relationships with the Debtors. The Debtors have not needed to borrow any funds under the DIP Financing.

The managers, officers and executives listed in the Limited Stipulation of Facts, or their successors, are or will be responsible for the management of the business of the Debtors during the administration of these bankruptcy cases.

## ENRON METALS & COMMODITY CORP.

EMC is a Delaware corporation with its principal place of business in New York, New York. EMC is engaged primarily in the business of commodities metals trading.

EMC's Voluntary Petition identified the location of its principal assets as New York, New York. These assets consist, among other things, of the following:

a. furniture, fixtures and equipment, located at 520 Madison Avenue, New York, New York;

b. deposit accounts, located at Citibank, New York;

c. contracts, accounts receivable, and prepaid transactions, the payment of which is to be made to the following address: 520 Madison Avenue, New York, New York; and

d. trades in progress.

Using the asset values assigned by the Debtors on the date of filing, Enron Metals' assets ($265,622,903) are less than 0.5% of the assets of the consolidated Debtors ($51,523,148,911).

EMC has approximately fifty-five employees working in New York, New York. EMC has three employees in St. Louis, five in Chicago and none in Texas. EMC's auditors are located in New York. EMC's corporate minute book is located in Houston. In addition, EMC has three directors on its board. One director resides in New York; the other two reside in Houston.

Of EMC's eleven executives and officers, four reside in New York, six in Houston and one in London.

## AFFILIATED DEBTORS (INCLUDING ENRON CORP.)

Of the twenty-eight affiliated debtors, including Enron Corp., twenty-six have their principal place of business located in Houston. For most of the affiliated debtors, including Enron Corp., the location of the principal assets and the location of the corporate books and records is also in Houston.[6] Nearly all of the executives and officers reside in Houston.

## THE DEBTORS' PROFESSIONALS

Debtors have retained the law firm of Weil, Gotshal and Manges LLP ("WGM") to represent them in connection with their bankruptcy. WGM has its principal law offices in New York and also has offices in Houston and Dallas. WGM's principal bankruptcy and restructuring department is based in New York. Both WGM's Houston and Dallas offices have a corporate restructuring section and experienced bankruptcy practitioners.

The Debtors have employed Leboeuf, Lamb, Greene & MacRae, LLP ("LLG & M") as special counsel. LLG & M has its principal office in New York and has an office located in Houston.

The Debtors have employed Andrews & Kurth LLP as special counsel to represent the Debtors in their bankruptcy. Andrews & Kurth's principal office is located in Houston where it employs over 200 attorneys. Andrews & Kurth also has offices in New York.

Prior to their bankruptcy, the Debtors employed 145 lawyers in their Houston offices. As of May 2001, if Enron's legal

department in Houston were a private firm, it would have been Houston's sixth-largest. Arthur Andersen LLP ("Arthur Andersen") has worked as Enron's outside auditor for more than ten years. Arthur Andersen accountants and consultants used to occupy an entire floor at Enron's headquarters in Houston, Texas. Last year Arthur Andersen earned over $50 million for audit and consulting work it performed for Enron. The Houston office of Arthur Andersen has conducted the Enron audits since at least 1997.

## FOREIGN INSOLVENCY PROCEEDINGS

A number of Enron affiliates are in insolvency, bankruptcy or administration proceedings worldwide.

## ACCESSIBILITY OF NEW YORK

New York is one of the world's most accessible locations. New York is served by three airports with international flights, as well as major rail stations making it accessible to parties in interest located worldwide. It is convenient with respect to both the diversity of locations served and the frequency of service provided.

New York is located over 1,600 miles from Enron's corporate headquarters in Houston which is located a few blocks from the United States Bankruptcy Court for the Southern District of Texas. A roundtrip flight from Houston to New York takes approximately seven hours. The average price of a roundtrip ticket from Houston to New York, full coach fare, is $1,807.85. No flights departing from Houston, Texas arrive in New York prior to 10:00 a.m. Eastern Time.

---

6. However, the Debtors stated on the record of the hearing that they may have business records located in offices other than those in Houston offices.

## REORGANIZATION PROCEEDINGS

There are six principal employees of the Debtors who are expected to be responsible for the financial restructuring and development of a plan of reorganization, and they are based in Houston. Other persons expected to be substantially involved are:

 a. Representatives of Enron's Canadian affiliates, who are located in Canada.

 b. Representatives of Enron's United Kingdom affiliates, who are located in the United Kingdom.

 c. Additional representatives of other Enron affiliates around the world will likely be involved, but the specific affiliates have not yet been identified.

 d. The Debtor's outside professionals, including WGM, which is based in New York, and is principally staffing these cases with attorneys from its New York office. Also involved will be the Blackstone Group, financial advisors, who are based in New York; and Batchelder & Partners, financial advisors, who are based in San Diego. Subject to court approval, the Debtors are also retaining PricewaterhouseCoopers, through its New York office, as financial advisors.

 e. The members of the Committee and their professionals. As previously noted, six of the fifteen members are located in New York, three in Texas. The Co Chairs are located in Minneapolis, Minnesota and Tulsa, Oklahoma. The Committee's counsel, subject to court approval, is Milbank, Tweed, Hadley & McCloy, which is based in New York. The Committee's financial advisors, subject to court approval, are Ernst & Young, through its New York office.

 f. The principal financial institutions expected to be involved in the plan of reorganization and financial restructuring are JP Morgan Chase Bank and Citibank, both of which are based in New York. The attorneys for JP Morgan Chase are Davis, Polk & Wardwell, which is based in New York. The attorneys for Citibank are Shearman & Sterling, which is based in New York.

At the time the Limited Stipulation of Facts was prepared, the principal persons believed to have substantial knowledge of the matters at issue in the Enron/Dynegy adversary proceeding were the following:

 a. Enron employees, all of whom are based in Houston: Ken Lay, Greg Whalley, Jeff McMahon, Raymond Bowen, Bill Brown, Stan Horton, Mark Muller and Mitch Taylor.

 b. Representatives of J.P. Morgan Securities, Inc., based in New York, including Douglas Braunstein and James Elliott.

 c. Representatives of Salomon Smith Barney based in New York, including Robert Hoglund, Gregg Polle and Alberto Verme.

 d. Representatives of JP Morgan Chase based in New York, including Jimmie Lee and other persons to be identified in discovery proceedings.

 e. Representatives of Citibank based in New York, including Michael Carpenter and other persons to be identified in discovery proceedings.

 f. Representatives of Moody's Investor Service based in New York, including Debra Perry, Peter Nerby, John Cassidy, John Diaz, Susan Abbot and possibly others to be identified in discovery proceedings.

 g. Representatives of Standard & Poor's based in New York, including John Biardello and Ron Barone and possibly others to be identified in discovery proceedings.

 h. Representatives of Fitch IBCA based in New York, including Ralph Pellechia and possibly others to be identified in discovery proceedings.

i. Representatives of Dynegy, believed to be based in Houston: Chuck Watson, Stephen Bergstrom, Rob Doty, Keith Fullenweider, Hugh Tarpley, and Jeff McParland.

j. David O' Reilly of Chevron Texaco, based in California.

## DISCUSSION

Section 1408 of title 28 of the United States Code governs venue in Chapter 11 cases. 28 U.S.C. § 1408 provides that a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408.

■■■ Under § 1408(1), a prospective debtor may select the venue for its Chapter 11 reorganization. Specifically, venue is proper in any jurisdiction where the debtor maintains a domicile, residence, principal place of business *or* where its principal assets are located for at least 180 days before the filing of the bankruptcy petition. Pursuant to 28 U.S.C. § 1408(2), venue is also proper for any affiliate [7] that files a bankruptcy petition within a venue where there is already a bankruptcy case pending under § 1408(1).

■■ Applied here, EMC filed a petition under the Bankruptcy Code on December 2, 2001 and was assigned case number 01–16033. EMC maintains its business operations in New York City. EMC conducted its principal business of trading metals commodities out of the New York offices. There is no indication from the record that EMC has not conducted its trading operations for less than 180 days. Therefore, for purposes of venue under 28 U.S.C. 1408(1), the Court finds that EMC's bankruptcy petition was properly venued in the Southern District of New York because EMC maintains its principal place of business within this district.

Enron Corp. is the holding company that directly or indirectly owns all the other Debtors. Immediately after EMC's case was filed in this Court, Enron Corp., as an affiliate of EMC, filed its petition under the Bankruptcy Code on December 2, 2001 and was assigned case number 01–16034. Its selection of this venue was proper under 28 U.S.C. § 1408(2). Thereafter, the remaining Debtors filed petitions as affiliates of a case pending in this Court for which 28 U.S.C. § 1408(2) likewise provides a basis for venue.[8]

---

**7.** Section 101(2) of title 11 of the United States Code defines affiliate to include:

 (A) [an]entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, ... [or]

 (B) [a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or

held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor....

11 U.S.C. § 101(2).

**8.** The parties did not concede in the Limited Stipulation of Facts that venue is proper. The Movants stated on the record that for the

When venue is determined to be proper in the district where the bankruptcy case was filed, the case may nevertheless be transferred, on motion by a party, pursuant to 28 U.S.C. § 1412 which provides that:

A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

See also Fed. R. Bankr.P. 1014(a)(1).[9] The bankruptcy court's authority to exercise the district court's power to transfer a case under 28 U.S.C. § 1412 stems from the district court's referral of the case to the bankruptcy court pursuant to 28 U.S.C. § 157(a). In re Waits, 70 B.R. 591, 594 (Bankr.S.D.N.Y.1987); In re Oceanquest, 56 B.R. 715, 718–19 (Bankr.D.Conn.1986). A motion to transfer venue is a core matter, as it concerns administration of the estate. Id.

The burden is on the movant to show by a preponderance of the evidence that the transfer of venue is warranted. See, e.g., Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Products Corp.), 896 F.2d 1384, 1390 (2d Cir.1990); Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.), 596 F.2d 1239, 1241 (5th Cir. 1979) ("CORCO"); In re Eclair Bakery Ltd., 255 B.R. 121, 141 (Bankr.S.D.N.Y. 2000); Huntington Nat'l Bank v. Industrial Pollution Control, Inc. (In re Industrial Pollution Control, Inc.), 137 B.R. 176, 180 (Bankr.W.D.Pa.1992); In re Suzanne de Lyon, Inc., 125 B.R. 863, 868 (Bankr. S.D.N.Y.1991); In re Garden Manor Assoc., L.P., 99 B.R. 551, 553 (Bankr. S.D.N.Y.1988). The decision of whether to transfer venue is within the court's discretion based on an individualized case-by-case analysis of convenience and fairness. See, e.g., Manville, 896 F.2d at 1391 (analogizing adjudication under 28 U.S.C. § 1404 and citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)); CORCO, 596 F.2d at 1247; Eclair Bakery Ltd., 255 B.R. at 141; In re Seton Chase Assoc., Inc., 141 B.R. 2, 5 (Bankr.E.D.N.Y.1992); In re Vienna Park Properties, 125 B.R. 84, 87 (S.D.N.Y.1991); Garden Manor, 99 B.R. at 553.

Transferring venue of a bankruptcy case is not to be taken lightly. CORCO, 596 F.2d at 1241 ("the court should exercise its power to transfer cautiously") (citation omitted); In re Pavilion Place Associates, 88 B.R. 32, 35 (Bankr.S.D.N.Y.1988) ("Transfer is a cumbersome disruption of the Chapter 11 process.") (citations omitted).

A debtor's choice of forum is entitled to great weight if venue is proper. In re Ocean Properties of Delaware, Inc., 95 B.R. 304, 305 (Bankr.D.Del.1988); In re Windtech, 73 B.R. 448 (Bankr.D.Conn. 1987). "Where a transfer would merely

purposes of this hearing and to avoid having to adjourn the hearing if they were to amend their motion to include a claim that venue was not proper under 28 U.S.C. § 1408, they would proceed with their motion with respect to 28 U.S.C. § 1412 as originally filed.

9. Fed. R. Bankr.P. 1014 provides:
 (a) Dismissal and Transfer of Cases.
 (1) Cases Filed in Proper District. If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of parties.
 Fed. R. Bankr.P. 1014.

shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed." *Garden Manor*, 99 B.R. at 555 (citing 1 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.10 (2d ed.1988)); *In re Great American Resources, Inc.*, 85 B.R. 444 (Bankr.N.D.Ohio 1988) ("venue decisions should not merely shift the inconvenience from one party to another") (citations omitted). The decision to transfer requires an examination of a broad array of factors, and a bankruptcy court's decision denying or transferring venue will only be reversed if the court's decision constitutes an abuse of discretion. *Manville*, 896 F.2d at 1391; *CORCO*, 596 F.2d at 1247; *Vienna Park*, 125 B.R. at 87.

 Pursuant to 28 U.S.C. § 1412, the Court must grant relief if it is established that a transfer of venue would be proper if it is in (1) the interest of justice or (2) the convenience of the parties. In considering the convenience of the parties, the Court weighs a number of factors:

1. The proximity of creditors of every kind to the Court;

2. The proximity of the debtor to the Court;

3. The proximity of the witnesses necessary to the administration of the estate;

4. The location of the assets;

5. The economic administration of the estate; [10] and

6. The necessity for ancillary administration if liquidation should result. [11]

*CORCO*, 596 F.2d at 1247. The factor given the most weight is the promotion of the economic and efficient administration of the estate. *Id.*

 When considering the "interest of justice," the court applies a broad and flexible standard. *Manville*, 896 F.2d at 1391. The court considers whether transfer of venue will promote the efficient administration of the estate, judicial economy, timeliness, and fairness. *Id.*

 This Court is guided by numerous cases examining whether to transfer venue pursuant to 28 U.S.C. § 1412, many within this district. However, the Second Circuit has not addressed the transfer of a bankruptcy case pursuant to 28 U.S.C. § 1412. [12] The seminal circuit court case on the issue of whether to transfer venue of a bankruptcy case under 28 U.S.C. § 1412 and Federal Rule of Bankruptcy Procedure 1014 is *CORCO*. [13] In *CORCO*, the Fifth

10. Most courts address this factor in terms of both the "economic" and "efficient" administration of the estate. *See, e.g., CORCO*, 596 F.2d at 1247 ("most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate.").

11. This factor is often discounted by the courts. *See CORCO*, 596 F.2d at 1248 ("anticipation of the failure of the Chapter XI proceeding is an illogical basis upon which to predicate transfer.") (citation omitted); *In re Suzanne de Lyon, Inc.*, 125 B.R. 863 (Bankr. S.D.N.Y.1991) ("structuring the Chapter 11 proceeding with the anticipation of its failure is inconsistent with its rehabilitative purpose,

and should not form the basis for transfer of venue.")

12. The Second Circuit did address transfer of an *adversary proceeding* in *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384 (2d Cir.1990), as discussed hereinafter.

13. Although the *CORCO* opinion was decided in 1979 under the former Bankruptcy Act and Federal Rule of Bankruptcy Procedure 116(b)(1), courts continue to apply the same analysis pursuant to current 28 U.S.C. § 1412 (effective July 10, 1984) and Federal Rule of Bankruptcy Procedure 1014. *See* Collier on Bankruptcy, ¶ 1014.02[2][a], 1014–4 (15th ed. rev.2001).

Circuit examined whether to transfer venue to Puerto Rico of an oil refining company debtor and eleven subsidiaries that filed a Chapter XI petition for reorganization in San Antonio, Texas. The Fifth Circuit concluded that the bankruptcy court did not abuse its discretion in retaining the bankruptcy case.

In examining the factors delineated by the bankruptcy court, the Fifth Circuit determined that the proximity of creditors (and stockholders) favored San Antonio; that the location of management and witnesses weighed in favor of San Antonio, but that the Debtor's assets and original books and records were in Puerto Rico. The court placed little emphasis on the location of the assets [14] and discounted the consideration concerning ancillary administration.

The Fifth Circuit also addressed the "interest of justice" prong of § 1412. In so considering, the court retained venue in the location best suited to solve the financial problems of the debtor and to be the least disruptive to the operations of the debtor. *Id.* at 1248.

The Fifth Circuit's decision in *CORCO* is the only circuit court decision directly on point, and the guidelines set forth in the *CORCO* decision are cited in virtually every opinion this Court reviewed concerning the transfer of a bankruptcy case in its entirety. There appears to be no dispute that the factors set forth in the *CORCO* decision are to be considered by this Court.

◼ As stated above, there is no Second Circuit authority directly addressing the transfer of a bankruptcy case in its entirety.[15] However, this Court finds instructive the Second Circuit's decision in *Manville* addressing the transfer of an adversary proceeding within a bankruptcy case. *See Manville*, 896 F.2d 1384; *See In re Shorts Auto Parts*, 136 B.R. 30, 35 (Bankr.N.D.N.Y.1991) (addressing the *Manville* decision in considering whether transfer of the bankruptcy case as a whole was appropriate).

The Second Circuit in *Manville* did not specifically reference the decision by the Fifth Circuit in *CORCO*.[16] However, similar factors were applied. The Second Circuit in *Manville* affirmed the district court's balancing of factors, such as the fact that the bankruptcy court had developed a substantial learning curve, as well as the court's considerations under the interest of justice component of judicial economy, timeliness and fairness. *Manville*, 896 F.2d 1384.

---

14. The court noted that if the goal of the Chapter 11 case is financial rehabilitation, the location of the assets is not an important factor.

15. Some of the Movants cite recent Second Circuit authority addressing *forum non conveniens* dismissal for the proposition that this Court should not provide Debtors' venue choice the customary deference afforded under 28 U.S.C. § 1412. *See Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir.2001) (en banc).

The Court finds the *Iragorri* decision distinguishable from the matter before the Court because the Court is not confronted with dismissal under the common law doctrine of *forum non conveniens*. Instead, the Court is dealing with a motion to transfer venue under the statutory authority of 28 U.S.C. § 1412 in this bankruptcy case. While the doctrines of 28 U.S.C. § 1412 and *forum non conveniens* have some overlap, 28 U.S.C. § 1412 determinations, particularly when considering transfer of a bankruptcy case in its entirety, are driven to a much greater degree by the needs and concerns of many constituent bodies and potential economic effects on parties across the country or around the world.

16. The decisions of the bankruptcy court and district court were not published.

In the context of the Debtors' cases, the factors considered cannot be viewed in an insular manner. Rather, the standards must be applied with a broader perspective, taking into account the national and international scope of the Debtors' businesses as well as the geographical dispersal of the creditors involved. Moreover, the standards must be applied considering the realities of the administration of a complex chapter 11 debtor seeking to reorganize. In summary, in addressing the convenience of the parties and the interest of justice, this Court will examine the *CORCO* factors as well as the learning curve issue, while taking into consideration the efficient administration of the bankruptcy estate and matters of judicial economy, timeliness and fairness based upon the unique facts and circumstances of the Debtors' complex corporate structure-with the outcome of its bankruptcy reorganization having worldwide implications. *See Manville,* 896 F.2d at 1391 (citations omitted).

### Convenience of the Parties

### The proximity to the court of the creditors and necessary witnesses

In considering the proximity of creditors, this Court must examine both the number of creditors as well as the amount of claims held by such creditors. *See CORCO,* 596 F.2d at 1248 ("both number and size are of equal significance in gaining acceptance of a plan and should be of equal significance in considering the convenience of creditors."). The Debtors' cases have been referred to as the largest bankruptcy ever filed. Creditors exist worldwide with claims ranging in amount from thousands to billions of dollars.

In examining the list of top twenty creditors, and the numerous other creditors that have sought various forms of relief within the early stages of this case (as discussed hereinafter), it is evident to the Court that while some creditors would best be served by this bankruptcy case being located in Texas, for the remainder of creditors-national and worldwide, Texas provides no better venue, and perhaps may be more inconvenient, than New York. *See Industrial Pollution Control,* 137 B.R. at 181 (retaining venue of case in Pennsylvania where transfer to Ohio would be more convenient to Ohio creditors while less convenient to others). The Debtors' multifaceted business enterprises affect parties throughout the nation and world. New York's accessibility for all creditors (and stockholders) weighs in favor of a New York venue. *CORCO,* 596 F.2d at 1248 (considers proximity of creditors and stockholders).

In considering creditors of all kinds, the Court finds it relevant to weigh the position of the Committee in its statutory role as a fiduciary to and representative body of the unsecured creditors. The Committee consists of representatives of all of the creditor constituencies, including a former employee representative. As such, the position of the Committee, while not dispositive, is something that should be considered by the Court. *See Huntington Nat'l Bank v. Industrial Pollution Control (In re Industrial Pollution Control, Inc.),* 137 B.R. 176, 181 (Bankr.W.D.Pa.1992) (noting opposition to transfer by Committee of Unsecured Creditors); *In re Windtech, Inc.,* 73 B.R. 448, 451 (Bankr.D.Conn. 1987) (same); *In re Boca Development Assoc.,* 18 B.R. 648, 654 (Bankr.S.D.N.Y. 1982) ("[t]he factors involving the proximity of the court to most of the creditors are not significant here, since the creditors' committee and a majority of the creditors have voiced their support in favor of the debtor's choice of venue"). Counsel for the Committee has indicated the Committee's strong opposition to a transfer of the

bankruptcy case, and the Committee filed pleadings in support of retention of the case in New York.

Furthermore, the Debtors' largest creditors-the banks (holding debt in their own name and serving as Indenture Trustees for publicly traded notes and bonds for more than twenty-five indentures, both foreign and domestic) oppose transfer of venue in these cases. JP Morgan and Citibank also oppose transfer of venue in their capacity as debtor in possession lenders.

In the five weeks this case has been pending, there has been significant and diverse creditor participation—diverse both as to the nature of the claim and the location of the claimant. Indeed, more than 225 entities have either sought, or responded to, relief requested before the Court. It is clear that those who are participating in these cases are not as localized as the Movants argue. Although the business relationship between the Debtors and the creditors may have been initiated from a desk in Houston, its impact is far reaching and geographically diverse.

With respect to the parties necessary to appear in court, the Movants argue that the largest aggregation of certain creditors, such as employees and trade vendors, is in Texas. The parties presented charts and documentary evidence representing the location of various creditors, presumably in order to show their nexus, or lack thereof, to New York and Texas. The Movants emphasize that an overwhelming percentage of trade and vendor creditors are located in Texas. However, the Movants' numbers take into consideration inter-company debt. If the debts owed to

inter-company Debtors are removed, the percentage of debt owed to Texas entities drops from approximately 90% to 34%, with the balance (66%) being held by non-Texas entities. Of the 66% representing trade and vendor debt not in Texas, 20% is owed to creditors in New York and 46% is owed to creditors outside of both New York and Texas. If the same analysis is applied with respect to the creditors in terms of number versus amount, the percentage in number located in Texas is 33%, and the percentage of creditors located outside of Texas is 67%.

If the Court were to accept Movants' argument that inter-company debt should be considered, then approximately 88% of the trade and vendor debt in amount would be held by Texas entities. However, in that case 90% would be held by Debtor entities who oppose transfer of venue. Finally, there is a large percentage of overall debt owed to banks located in New York and a significant amount of bond and noteholder debt located worldwide.

Concerning Enron's former employees, the Court is sympathetic to their concerns and the fact that if venue remains in New York many of them would find it burdensome to attend hearings. However, it is not certain that all the issues that the former employees may want addressed, such as the factors that led to Enron's collapse and those who may have been responsible for the collapse, will be brought before the bankruptcy court. Yet it is clear that such issues will certainly be addressed by Congressional investigations and the investigations by federal departments and agencies.[17] The major issues

17. Those responsible for the collapse of Enron and the factors relating thereto are the primary focus of these governmental investigations. The importance of resolving these

concerns and seeking solutions to prevent such events from reoccurring cannot be overstated. However, although these issues may at times overlap with the relief sought before

impacting former employees involve the 401(k) Plan. Whether they are resolved in the ERISA Action or in the claims resolution process in the bankruptcy cases, and regardless of where the cases are venued, these issues are best addressed by a former employee representation approach.[18] This would generally not require the claimants to actually appear in court to have their rights protected and concerns raised. To the extent the former employees' concern is that it would be burdensome to follow the progress of this case, the Court will address that issue as discussed hereafter.

While substantially all of the Debtors' officers are located in Houston, most will not be required to attend hearings before this Court. Rather, the certain participants in the proceedings before this Court will be the professionals retained in these cases.[19] Subject to court approval, appearances required by the officers (or other management) can be addressed by telephonic and video conferencing capabilities.[20] The limited appearances that may be required of the principals will nevertheless allow them to continue with the management of the businesses.

The Attorney General of Texas has filed its support for transfer of venue. There are also many Texas state and local authorities that have an economic interest to be protected. However, the non-judicial administration of these claims will take place in Texas. To the extent that judicial intervention is required, these departments and agencies, like other parties who find it burdensome to travel to attend hearings, can utilize alternative methods of participation that will be set forth in the case management order referenced in footnote 20. However, in terms of the financial restructuring, it does not appear that tax claims are going to be a significant issue of contention.

With respect to accessibility of this Court to all parties-in-interest, the dockets of all of the cases pending before the Southern District of New York are currently available on the internet at the Court's web-site by obtaining a PACER password. The electronic filing system allows those with an interest to have access to all pleadings filed in any case. Moreover, pursuant to the Federal Rules of Bankruptcy Procedure, any pleading that directly impacts any employee or creditor is required to be served upon such individual or entity. In addition, the Court will make every effort to afford those burdened by the cost of travel an opportunity to participate by alternative means as previously mentioned.

### The location of the assets and the proximity of the debtor

The location of the assets is not as important where the ultimate goal is rehabilitation rather than liquidation. *CORCO*, 596 F.2d at 1248. Although the Debtors are seeking to sell a portion of

---

this Court, the primary focus of the Debtors' cases must be the financial restructuring of the Debtors. The objective is to preserve and create value for the benefit of the estates while ensuring that the "interest of justice" and "the convenience of the parties" are served.

18. The issues of the formation of an official committee, pursuant to § 1102, to represent the interests of the former employees is not before the Court.

19. The professionals' participation will be more fully addressed in the discussion concerning the economic and efficient administration of the estate.

20. The Court will soon issue an Enron case management order. In that order, amongst other administrative matters, there will be a procedure addressing telephonic and video participation.

their assets to facilitate their financial restructuring, this is not a Chapter 7 liquidation. Furthermore, while a debtor's location and the location of its assets are often important considerations in single asset real estate cases, these factors take on less importance in a case where a debtor has assets in various locations.

While the majority of the Debtor entities have their headquarters in Texas, Enron's assets are geographically located throughout the world. Aside from the office building and other tangible assets which are located in Texas,[21] much of the Debtors' assets consist of contracts and trading operations which have no tangible location.[22] Furthermore, the presence of the books and records in Houston is not a major concern because with modern technology that information, which is ordinarily computerized, can be readily transported via electronic mail.

### Economic and efficient administration of the estate

■ It is clear that the most important of these considerations is the economic and efficient administration of the estate. *See e.g.,* CORCO, 596 F.2d at 1247; *Huntington National Bank v. Industrial Pollution Control, Inc. (In re Industrial Pollution Control, Inc.)*, 137 B.R. 176, 182 (Bankr. W.D.Pa.1992). This factor has been examined in terms of "the need to obtain postpetition financing, the need to obtain financing to fund reorganization, and the location of the sources of such financing and the management personnel in charge of obtaining it." *Id.; In re International Filter Corp.*, 33 B.R. 952, 956 (Bankr. S.D.N.Y.1983).

■ In *In re Garden Manor Associates,* the court retained venue of a single asset real estate debtor, whose sole asset was located in another jurisdiction, after taking into consideration the fact that New York was the location where the debtor could most successfully reorganize. 99 B.R. 551, 554–55 (Bankr.S.D.N.Y.1988). This is the ultimate purpose of a Chapter 11 bankruptcy case. The court in *Garden Manor* found that the case turned on the debtor's ability to raise capital, renegotiate loan terms, locate a potential purchaser, or execute a potential cram down of its major secured creditor. *Id.* While the general partner and managing agent were located in New York, the court also found it relevant that the parties most likely to be a source of capital were located in New York. Therefore, the court found that efforts to reorganize could best be carried forth in New York.

In *CORCO*, the Fifth Circuit found that the heart of the reorganization proceeding is formulating a financial plan of arrangement acceptable to all relevant parties. *CORCO*, 596 F.2d at 1247. The *CORCO* court was asked to weigh the fact that operations and substantial assets of the Debtor were located in Puerto Rico against the fact that the financial management was in San Antonio. In the context of a reorganization, the court found in favor of retaining venue in San Antonio because the debtor's problems were financial and those who could solve these issues were in San Antonio. *See also In re Fairfield Puerto Rico, Inc.*, 333 F.Supp. 1187, 1191 (D.Del.1971) (refusing to transfer venue to the location of the debtor's principal office, assets and most creditors, because the location best to achieve success

21. Certain of the tangible assets held in Texas consist of stock representing ownership of corporations located throughout the world.

22. This Court has already approved bidding procedures for the sale by certain of the Debtors of a portion of Enron's wholesale trading business.

of the bankruptcy reorganization was where it could develop markets for its product and secure FDA approval).

■ One must examine the realities of this case. It is the largest bankruptcy case ever filed, the complexities of which are yet to be fully appreciated. Its reorganization will depend in great part on the ability of the Debtors' advisors and senior managers to achieve a financial restructuring that will result in the capital markets regaining confidence in the Debtors, thereby affording the Debtors full and complete access to those markets. New York is a world financial center and, as such, has the resources that will be required to address the Debtors' financial issues. Most of the entities and individuals expected to be responsible for the financial restructuring and development of a plan of reorganization in this case are located in New York or have ready access to New York, including most of the Debtors' legal and financial advisors as well as the legal and financial advisors to the Committee and the lenders. Those members of the financial community that provide access to capital necessary to the Debtors' financial restructuring are located in New York. Furthermore, while the Debtors' management and operations are predominantly in Houston, New York is a more convenient location for those responsible for negotiating and formulating a plan of reorganization. The Court finds that New York is the more economic and convenient forum for those whose participation will be required to administer these cases. Accordingly, New York is the location which would best serve the Debtors' reorganization efforts-the creation and preservation of value.[23]

### The necessity for ancillary administration if liquidation should result

This Court finds it unnecessary to contemplate the failure of this case at this early stage. Even if a liquidation were to occur, the types of assets and the disparate location of many foreign subsidiaries would favor retention of venue in a location near essential capital markets necessary to maximize liquidation value.

### Interest of Justice

■ The interest of justice prong is a broad and flexible standard that is applied based on the facts and circumstances of each case. See Manville, 896 F.2d at 1391. In evaluating the interest of justice, the Court must consider what will promote the efficient administration of the estate, judicial economy, timeliness and fairness. Id. The Court finds that the considerations involved with the interest of justice are intertwined with the economic and efficient administration of the estate. As already discussed, the administration of this estate will be best promoted by retaining venue in this Court. In addition, in considering both the efficient administration of the estates and judicial economy, it is also necessary to take account of the "learning curve." The learning curve analysis involves consideration of the time and effort spent by the current judge and the corresponding effect on the bankruptcy case in transferring venue. In re Vienna Park Properties, 125 B.R. 84, 87 (S.D.N.Y.1991) (finding that the bankruptcy court did not err in considering the learning curve).

In Manville, the Second Circuit found that although the convenience of the parties and witnesses weighed in favor of

---

**23.** In considering the economic and efficient administration of the estate, the learning curve issue is an important factor. However, the learning curve also impacts considerations of the interest of justice which seeks to promote the efficient administration of the estate and judicial economy. To avoid duplication of issues, the Court will address the applicable learning curve with respect to the interest of justice prong of 28 U.S.C. § 1412.

transfer (which this Court has not found), the efficient administration of the case, such as the fact that the bankruptcy court had developed a substantial learning curve, weighed in favor of retention of the case. *Manville*, 896 F.2d at 1391.

This Court has gained familiarity with many of the issues that have and will continue to arise in these cases. A substantial number of motions have been filed and were scheduled to be heard within the first month of these cases. Some of them have already been held and concluded. While other matters previously scheduled to have taken place by this date have subsequently been adjourned, the Court had already familiarized itself with many of the pleadings filed in those matters. In addition, the Court has been required to educate itself on a variety of issues to provide interim relief on an emergent basis.

The Movants argue that since they timely filed their motions to transfer venue, the "learning curve" should not be considered. However, the importance of maintaining stability in these bankruptcy cases required the Court to direct its immediate attention to the proper administration of these cases. A review of the docket shows that many requests for shortened notice were filed for matters to be heard concerning a myriad of issues, including claims that supplies of energy were to be imminently discontinued. These issues had to be immediately addressed.

Maintaining the stability of these cases and ensuring their proper administration had to take precedence over the request for an expedited venue hearing. This is especially true in light of the fact that these cases were properly venued pursuant to 28 U.S.C. § 1408. Thus, although the Movants filed a timely request for the transfer of venue, diverting the Debtors' and Committee's attention to the motion for transfer of venue would have been counterproductive to the needs and interests of these cases during the initial stages of these cases. Moreover, although certain of the Movants initially requested a shortened time frame for notice of a hearing, that request was subsequently withdrawn while certain Movants pursued discovery. Thus, while the Movants were not dilatory, the necessities of this case resulted in an accrual of knowledge by the Court.

Further, as previously discussed, the learning curve that has been established in the Enron Debtors' cases contributes to judicial economy. A transfer at this time would not promote judicial economy as it would only delay pending matters while a transferee court familiarized itself with the intricacies of these cases.

These Debtors' cases have a global presence. Indeed, affiliated entities have already filed insolvency proceedings in various countries. Further promoting judicial economy is the fact that this Court has familiarity with Cross Border Insolvency cases, having presided over (i) cases regarding parallel proceedings in Canada and the United States, and (ii) 11 U.S.C. § 304 proceedings involving insurance insolvencies in Australia. This Court has experience in developing a protocol to facilitate the coordination of proceedings in this Court and the proceedings conducted in a foreign jurisdiction. Moreover, this Court conducted video hearings regarding the foreign proceedings referred to above. Thus the interest of justice also supports retention of venue in this district.

The goal of these chapter 11 cases is the reorganization of the Debtors. The parties most essential to that purpose are located in New York. The Debtors, whose finances are extremely complex, will need access to the capital markets and financial experts available in New York. The negoti-

ation and confirmation of a plan of reorganization necessitate substantial involvement by the professionals retained by the Debtors, the Committee, and the financial institutions, which are all primarily located in New York. Thus, the significant financial and legal decisions concerning the efforts to restructure the Debtors will be made in New York. The fact that New York is a financial center and the presence in New York of those who will participate on a consistent basis in these cases make New York the most efficient forum for administering these cases.

The Court finds that in considering matters of judicial economy, timeliness and fairness as well as the efficient administration of the estate, the interest of justice is served by retaining jurisdiction.

## CONCLUSION

The Court finds that the Movants have not shown by a preponderance of the evidence that transfer of venue is in the interest of justice or for the convenience of the parties. For the reasons stated herein, this Court will retain venue of these bankruptcy cases and thus the motions to transfer venue are denied.

The Debtors are directed to settle an order consistent with this Memorandum Decision.